# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**FORD MOTOR COMPANY,**

     **Plaintiff,**

**v.**                             **Case No. 8:09-cv-2137-T-30TBM**

**O.E. WHEEL DISTRIBUTORS, LLC,**
**O.E. RACING, LLC, and JAMES E.**
**MOORE,**

     **Defendants.**
_____/

## ORDER

THIS CAUSE comes before the Court upon: (I) Plaintiff's Motion for Summary Judgment on its Affirmative Claims (Dkt. 113), and Defendants' Memorandum in Opposition (Dkt. 127); (ii) Plaintiff's Motion for Summary Judgment on Defendants' Affirmative Defenses (Dkt. 114), and Defendants' Memorandum in Opposition (Dkt. 127); and; (iii) Defendants' Motion for Partial Summary Judgment on its Counterclaims (Dkt. 110), and Plaintiff's Response in Opposition (Dkt. 125). After considering the parties' motions, responses, and being otherwise advised in the premises, the Court concludes that these three motions should be granted in part, and denied in part, as stated herein.

**Background**

Plaintiff Ford Motor Company ("Ford") brought this action against Defendants O.E. Wheel Distributors, LLC, O.E. Racing, LLC, and James E. Moore (collectively "OEW")[1] alleging counts of federal trademark infringement, counterfeiting, federal unfair competition, federal trademark dilution, Florida trademark dilution, common law trademark infringement and unfair competition, and violation of the Florida Deceptive and Unfair Trade Practices Act "FDUTPA."

Plaintiff Ford produces cars, trucks, and other automobile accessories. It owns numerous trademarks, many of which are federally registered. As part of its marketing effort, Ford utilizes various Ford trademarks such as the Ford oval, the "MUSTANG" word mark, and the Ford Running Horse, Horse and Bar, and Cobra designs. These trademarks are affixed to a variety of Ford products, including Ford wheels (typically being placed in the center of wheels as decorative pieces).

Defendants OEW, based in Sarasota, FL, sell enthusiast wheels (rims and tires). OEW originally sold refurbished original equipment "take-off" wheels from used cars. It subsequently started manufacturing its own replica and custom wheels. OEW's products fit numerous models of cars, from Ford to Toyota, from Chevrolet to BMW.

Prior to the instant lawsuit, OEW primarily sold its products over eBay. As an eBay seller, it attained "Titanium Power Seller" status, giving it special privileges reserved for

---

[1]James E. Moore is the owner of both OE Wheels Distributors, LLC, and OE Racing, LLC.

favored vendors. It also achieved an overall customer feedback score of 99.8%. Notably, it received a five star (out of five) rating from customers in the category "item as described."

OEW openly sold numerous Ford-compatible wheels on eBay. In listing such wheels for sale, it would highlight the fact that its wheels were meant to be used on Ford vehicles, by, for example, listing its products as "O.E. FORD MUSTANG WHEELS." Importantly, however, OEW would typically include a disclaimer (elsewhere on the web page) stating that such wheels were not affiliated with Ford in any way.

Ford contends that many of the wheels sold by OEW contained Ford trademarked designs affixed to their centers, including Ford's Running Horse, Horse and Bars, and Cobra designs. Frequently, such designs were affixed to center caps, which were then attached to OEW's wheel centers. OEW contends that many of these center caps were purchased from legitimate Ford dealers. Others were manufactured by OEW.

After Ford discovered that OEW was selling wheels with the above mentioned designs (in early 2008), it sent OEW a cease and desist letter demanding that OEW cease production of what Ford claimed were counterfeit wheels. Among other things, this letter specifically demanded that OEW cease producing OEW's originally manufactured cobra center cap (shown below, bottom right) which Ford claimed infringed its own cobra design (reproduced below, bottom left).

 

After discussions with Ford, OEW stopped manufacturing and selling the above-described cobra caps, and proceeded to design a new cobra cap which it believed was sufficient to meet Ford's objections. The new cap retained the cobra image shown above but superimposed the words "OE Racing" conspicuously upon the cobra image, as well as the term "OE Wheel Distributers" three times around the perimeter of the cap.

Ford was not satisfied with OEW's modification of its cobra logo, and/or its alleged continued infringement of other Ford trademarks. Although the parties engaged in some email communication with the goal of settling the case, discussions ultimately broke down, and Ford stopped communicating with Mr. Moore (Moore apparently thought Ford's concerns were resolved after Ford stopped communicating with him by email).

Ford later sued OEW, alleging, among other things, that OEW's advertising, wheels, and center caps infringed Ford trademarks. As discussed above, Ford alleges that OEW's originally manufactured cobra design infringes Ford's cobra symbol. Moreover, Ford claims that OEW additionally infringed Ford's trademarks as shown in the Ford-supplied chart reproduced below:

| Ford Registration | Defendants' Counterfeit Use |
|---|---|
| Reg. No. 1467208<br><br>MUSTANG word mark |  |
| Reg. No. 1416549<br><br> |  |
| Reg. No. 1686288<br><br> |  |
| Reg. No. 2268150<br><br> |  |

OEW contends that each of these uses was legitimate. First, with respect to OEW's originally manufactured cobra design, OEW contends that its cobra is significantly different from Ford's, and, as a result, does not constitute trademark infringement.

Second, with respect to the MUSTANG word mark, OEW contends that advertising its wheels on eBay using the MUSTANG mark constitutes nominative "fair use" because OEW had the right to use the mark in order to inform customers that its wheels fit Ford vehicles.

Third, with respect to the Ford Running Horse symbol, OEW contends that all wheels sold bearing this mark were genuine Ford products that OEW purchased from legitimate Ford dealers, and then subsequently resold in the automobile aftermarket.

Fourth, with respect to the Ford Horse and Bars symbol, OEW contends that it bought center caps bearing this symbol from legitimate Ford dealers, and then, upon affixing these center caps to its own wheels, sold them to "custom wheel enthusiasts" in the automobile aftermarket. OEW contends that such behavior is protected under the "First Sale Doctrine."

Fifth, with respect to the modified cobra design affixed to rims sold by Defendants, OEW contends that the center cap is significantly different from Ford's cobra such that its use would not be likely to confuse consumers.

Soon after filing its Complaint against OEW, Ford filed an ex parte motion for seizure of OEW's wheels bearing the above-described marks, which this Court granted. Shortly thereafter Ford executed the seizure, taking approximately 10,000 wheels. OEW contends that Ford made its motion for ex parte seizure in bad faith for the purpose of gaining an

unfair litigation advantage over OEW. In addition, OEW contends that Ford exceeded the authority of the seizure order by seizing all OEW wheels that fit Ford vehicles, rather than merely taking products bearing defined Ford marks.

After Ford carried out the ex parte seizure, OEW prepared a draft motion to vacate the seizure order, and sent it to Ford, demanding that Ford voluntarily return the wheels. The parties later negotiated a stipulated order for permanent injunction that, among other things, provided that Ford was to return all wheels, and that OEW was to be permanently enjoined from selling wheels with Ford trademarks. Notably, the permanent injunction also specifically enjoined OEW from selling wheels with OEW's modified cobra symbol containing the term "OE Racing" superimposed upon the logo.

While the stipulated permanent injunction resolves all of Ford's injunctive claims in this litigation, it fails to resolve the issue of damages. Moreover, the stipulated order did not waive OEW's right to challenge the seizure, and/or to assert counterclaims. OEW subsequently did bring counterclaims against Ford for: (1) wrongful seizure; and (2) abuse of process.

## Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an

otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson,* 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248; *Hoffman v. Allied Corp.,* 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989).

**Discussion**

## I. Ford's Motion for Summary Judgment on Its Affirmative Claims

Ford moves for summary judgment on its claims for federal counterfeiting, federal and common law trademark infringement, federal and common law unfair competition, and violation of the FDUTPA. It also moves for summary judgment on the issue of whether Defendants' alleged use of counterfeit Ford marks was intentional, knowing, and willful.

### A. Ford's Claims for Federal and Common Law Trademark Infringement and Unfair Competition

In order to demonstrate a prima facie case of trademark infringement and unfair competition, a plaintiff must show that: (1) it owns the trademarks at issue; (2) defendants used the marks without authorization; and (3) defendants' use is likely to cause confusion, mistake, or deception as to the source, affiliation, or sponsorship of defendants' goods. *See, e.g., Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1178 (11th Cir. 1994); *Dieter v. B&H Indus. of Sw. Florida,* 880 F.2d 322, 326 (11th Cir. 1989), *cert. denied,* 498 U.S. 950 (1990).

Here, it is undisputed that Ford both owns the various Ford marks at issue in this case and that Ford has not given OEW authorization to use such marks. Accordingly, the only issue for this Court to decide is whether OEW's use of various marks created a likelihood of confusion.

Likelihood of confusion is an issue of fact. *See, e.g., Dieter,* 880 F.2d at 326. In determining the likelihood of confusion, the Court should consider seven factors: (1) strength

of the plaintiff's mark; (2) similarity of the marks; (3) similarity of the goods and services offered under the two marks; (4) similarity of sales methods; (5) similarity of advertising methods; (6) Defendant's intent in utilizing the marks; and (7) evidence of actual confusion amongst the consuming public. *Blackwall Group, LLC v. Sick Boy, LLC* 771 F.Supp. 2d 1322, 1325 (M.D. Fla. 2011).

Here, the Court will first examine each of these seven factors as applied to the case as a whole, and then will proceed to analyze each alleged infringing use of Ford's marks with the goal of determining what issues, if any, may be decided upon summary judgment.

### 1. Likelihood of Confusion Factors

### (i) Strength of Ford's Marks

It is undisputed that Ford's MUSTANG word mark, MUSTANG Running Horse design, MUSTANG Horse and Bars mark, and Cobra design are all world famous. It is further undisputed that Ford has expended substantial time, effort, and money promoting these marks. Moreover, all of these marks, having no qualities inherently related to automobiles or auto accessories, qualify as "arbitrary or fanciful" trademarks. As such, they are entitled to the strongest level of protection (as opposed to marks that are generic or descriptive). *See, e.g., Gift of Learning Found. v. TGC, Inc.,* 329 F.3d 792, 797-98 (11th Cir. 2003).

### (ii) Similarity of the Marks

It is undisputed that Ford's MUSTANG word mark and the MUSTANG word mark used by Defendants is identical. Moreover, it is undisputed that the Running Horse Design

used by Ford and Defendants is identical (Defendants contend that the only time they utilized this design was in re-selling original Ford wheels). In addition, it is undisputed that the Horse and Bars Design used by Ford and that used by Defendants is identical.[2]

Defendants contend, however, that the two cobra center caps which they manufactured themselves are not similar to Ford's cobra design. With respect to OEW's original cobra logo, this Court concludes that they are exceedingly similar. While there are slight differences between the two images, the overall impression created by the marks is essentially the same, which is enough to show their affinity. *See, e.g., In re Triple R Mfg. Corp.,* 168 U.S.P.Q. 447 (T.T.A.B. 1970). Indeed, the similarities are obvious. Both marks are images of a cobra in an upright posture, both cobra heads are pointed in a Southeast direction, the mouth of each snake is open, and the tails of both cobras are coiled in a similar manner.

With respect to OEW's modified logo, however, it is not clear that both designs are closely similar. OEW's modified logo, with "OE Racing" conspicuously superimposed upon OEW's cobra design, and "OE Wheel Distributors" printed three times around the perimeter, functions to create a distinct impression from Ford's cobra design standing alone (although the fact that each design contains a similar cobra figure does show some significant similarity).

---

[2]Defendants admit that they used center caps with this design which they proceeded to attach to their wheels; however, they contend that all of these center caps were purchased from authorized Ford dealers.

In sum, the factor of similarity weighs strongly in favor of Ford with the exception of OEW's modified cobra design.

### (iii) Similarity of the Goods

"The greater the similarity between the products and services, the greater the likelihood of confusion." *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 976 (11th Cir. 1983) (quoting *Exxon Corp. v. Texas Motor Exch., Inc.,* 628 F.2d 500, 505 (5th Cir. 1980)).

Here, both Ford and OEW are in the automotive business and both sell wheels with trademarks affixed to the center. While the wheels (rims and tires) OEW manufactures may be slightly different than those manufactured by Ford, the fact that both sell wheels (not to mention the fact that wheels typically look similar to the untrained eye) is sufficient to show the similarity of the goods of Ford and OEW. *See, e.g., Exxon Corp. v. Texas Motor Exch., Inc.,* 628 F.2d 500, 505 (5th Cir. 1980) (finding a similarity between the parties' goods and services as both were heavily involved in the business of car care). Thus, this factor weighs in favor of Ford.

### (iv) Similarity of Sales and Advertising Methods

Both Ford and OEW advertised and sold products over the internet, which shows some similarity of sales and advertising methods. *See, e.g., Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1057 (9th Cir. 1999). Moreover, it is undisputed that both Ford and OEW marketed new, and/or used wheels to Ford vehicle owners; thus, it appears that there is at least some significant overlap between the two customer bases.

Notably, however, Ford did not start selling products on eBay until after it executed its ex parte seizure of OEW's wheels. Moreover, Ford sold through dealerships, whereas OEW sold only online. Thus, Ford and OEW's advertising and sales methods were far from identical. Moreover, OEW also claims that it sold its products to car enthusiasts with sophisticated knowledge of the car industry, which it asserts is a significantly different customer base than Ford's.

Although these two factors do not weigh strongly in favor of either party, they slightly tilt in favor of Ford as both companies advertised and sold wheels to Ford automobile owners via the internet.

### (v) Defendant's Intent in Selecting the Marks

While Ford presents significant evidence tending to show that OEW selected the marks in order to profit off of Ford's goodwill, OEW has offered sufficient evidence such that a reasonable juror could conclude otherwise. Indeed, OEW presents evidence that it believed that its use of each of the marks discussed herein was legitimate. Specifically, OEW contends that its use of the MUSTANG word mark constituted fair use, that its use of Ford's Running Horse and Horse and Bars designs were protected by the first sale doctrine (subsequently discussed herein), and that Defendants' various cobra designs were materially different from Ford's. Thus, a genuine issue of material fact exists with respect to the question of OEW's intent in using the marks.[3] As OEW has presented the Court with

---

[3]As the Court concludes that a genuine issue of material fact exists with respect to whether Defendants' infringement was intentional, knowing, and/or willful, the Court concludes that it is not
(continued...)

evidence that, if true, would establish OEW's benign intent in using the contested marks, for the purposes of summary judgment, this factor weighs in favor of OEW.

### (vi) Evidence of Actual Confusion

While it is not necessary to show actual confusion in order to demonstrate a likelihood of confusion, such evidence is helpful; indeed, it is the best evidence of likelihood of confusion. *Frehling Enters., Inc. v. Int'l Select Grp, Inc.,* 192 F.3d 1330, 1340 (11th Cir. 1999). Importantly, while "very little proof" of actual confusion is necessary to establish a likelihood of confusion, once a plaintiff identifies evidence of actual confusion, "an almost over whelming amount of proof [is] necessary to refute such [evidence]." *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir. 1971).

Here, Ford presents evidence that a potential customer was confused with one of OEW's listings. Specifically, the individual became confused upon viewing a listing selling "O.E. 18" SILVER MUSTANG SALEEN WHEELS RIMS TIRES 94-04." According to this individual, listing "O.E. MUSTANG WHEELS" for sale was confusing. The potential customer explained that as the letters O.E. are known in the industry to denote "original equipment," the ad was misleading because it implied that the vendor was offering original equipment Mustang wheels manufactured by Ford.

After bringing this issue to OEW's attention, OEW curtly replied that the potential customer must be "stupid" because the O.E. merely referred to OEW's name. The potential

[3](...continued)
appropriate to rule on the issue of Defendants' state of mind on summary judgment, as requested by Plaintiff.

customer later posted online his email thread conversation with OEW in an internet forum, where other potential customers weighed in. Some thought the ad was confusing, whereas others did not.[4]

Despite the fact that Ford has failed to present other instances of customer confusion, this one incident is nonetheless significant, especially given the fact that it is often difficult to acquire such evidence. *See, e.g., Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 284 (6th Cir. 1997).

This factor weighs in favor of Ford with respect to OEW's practice of listing "O.E. MUSTANG WHEELS" for sale (as well as other similar advertisements). However, the fact that Ford fails to present other evidence of customer confusion weighs against Ford with respect to OEW's other uses of contested marks which Ford alleges infringed its trademarks.

## 2.    Discussion

In determining whether Ford has met its burden on its trademark infringement and unfair competition claims, it is necessary to now analyze each of OEW's alleged infringing uses of Ford marks in order to determine whether any such use resulted in a likelihood of confusion. Informed by the Court's general discussion of the seven factors above, the Court now undertakes such an analysis.

---

[4]OEW argues that such evidence is inadmissible hearsay. This argument can be summarily dismissed as it is only introduced in order to show the state of mind of potential customers.

### (i) Ford's MUSTANG word mark

With respect to OEW's use of Ford's MUSTANG word mark in listings such as "O.E. FORD MUSTANG WHEELS," the Court concludes that Ford has shown a prima facie case of trademark infringement and unfair competition as there is a likelihood that such listings confusingly suggest that the vendor is selling original equipment Ford products.

Indeed, with respect to such listings it is undisputed that OEW used the MUSTANG mark to advertise its products, that the mark is identical to Ford's mark (which is strong), that it used similar sales methods to sell similar goods (wheels), and that actual customer confusion resulted from the use of this mark. Thus, the seven factors overall strongly point to a likelihood of confusion from using Ford's MUSTANG word mark in advertising "O.E. MUSTANG WHEELS" for sale, and it is therefore appropriate to rule on summary judgment on this issue, in favor of Ford.

Although such advertisements allegedly included disclaimers that such wheels were not affiliated with Ford, not being sufficiently prominently displayed, such disclaimers were insufficient to prevent actual customer confusion resulting from the reasonable impression created by the ad that the vendor was offering original equipment Ford wheels for sale.

However, the Court notes that its holding on this point is limited, as it only concludes that OEW's listing of "O.E. FORD MUSTANG WHEELS" (and like listings) constitutes trademark infringement as a matter of law. Other uses of the MUSTANG word mark by OEW may very well not have been confusing. For example, an ad which reads "Wheels fit for MUSTANG" would very likely not carry with it a likelihood of confusion. With respect

to other uses of Ford's MUSTANG word mark, Ford has presented no evidence of actual confusion, and has failed to clearly and adequately state which specific uses of its MUSTANG word mark it believes are infringing as a matter of law, and which are not. As Ford has failed to meet its burden on this issue, it is inappropriate to decide it at the summary judgment stage.

### (ii) Ford's Running Horse and Horse and Bars Designs

The Court concludes that summary judgment in favor of Ford is appropriate with respect to OEW's use of both Ford's Running Horse Design and Ford's Horse and Bars Design. Specifically, the Court concludes that Ford has met its prima facie case of trademark infringement and unfair competition with respect to OEW's use of these two marks. Among other things, it is undisputed that these marks are strong, that OEW utilized identical marks, that such marks were affixed to automobile wheels (a product both parties produce), and that both parties advertised products bearing such marks via the internet. Although Ford has not presented direct evidence of customer confusion with respect to OEW's use of these marks, such evidence, although helpful, is not necessary (nor is wrongful intent necessary). Moreover, even if OEW's customers did not experience point-of-sale confusion in purchasing OEW's wheels, the similarity of OEW's products to FORDs are, at a minimum, likely to create post-sale confusion. *See, e.g., Gen. Motors Corp., v. Keystone Auto. Indus.,* 453 F.3d 351, 358 (6th Cir. 2006) (post-sale confusion is both actionable and capable of

causing great harm to plaintiff's marks). As the seven factors weigh heavily in Ford's favor, this Court concludes that Ford is entitled to summary judgment on this issue.[5]

### (iii) OEW's First Cobra Design

While OEW's first cobra design was not identical to Ford's, the Court concludes, for the reasons previously discussed, that it is closely similar to Ford's cobra mark. As all of the other factors which support summary judgment with respect to OEW's use of Ford's Running Horse and Horse and Bars Designs apply equally here, it is appropriate to rule in favor of Ford with respect to OEW's use of OEW's first cobra design. Specifically, the Court concludes that Ford has met its prima facie case of trademark infringement and unfair competition with respect to OEW's use of its first cobra design.

### (iv) OEW's Second Cobra Design

The Court concludes that there is a genuine issue of material fact as to whether OEW's use of its second cobra design posed a likelihood of confusion. The second design, with the term "OE Racing" conspicuously superimposed upon the center cap and the term "OE Wheel Distributors" appearing three times around the perimeter, creates an impression distinct (although somewhat similar) from Ford's unadorned cobra mark. Combined with the fact that Defendants have presented evidence that they possessed benign intent in using the mark, and that Ford has shown no evidence of customer confusion, there is a genuine issue of material fact as to whether OEW's modified design is confusingly similar. Indeed,

---

[5]The Court notes that OEW vigorously asserts that it was entitled to use these marks based upon various affirmative defenses; however, this does not affect the viability of Plaintiff's prima facie case.

a reasonable juror could conclude that the new design, which contains four recitations of OEW company names, conspicuously discloses the product's true origin and affiliation. As a result, it is inappropriate to rule on OEW's use of its second cobra design on summary judgment.

## B. Ford's Other Claims

Ford also moves for summary judgment on its counterfeiting claims; these claims are discussed later in this Order. In addition, Ford moves for summary judgment on its FDUTPA claim. The Court concludes that it is not appropriate to rule on Ford's FDUTPA claim on summary judgment because Ford has failed to meet its burden as it has advanced no arguments, and/or facts showing why its FDUTPA claim should be granted.

## II. Ford's Motion for Summary Judgment on OEW's Affirmative Defenses

### A. OEW's Withdrawn Defenses

OEW has agreed to withdraw several of its affirmative defenses, including affirmative defenses 1,7,8,9,10,12,13,14,15,16,17,18,21, and 27. Accordingly, Ford is entitled to summary judgment on these defenses.

### B. Laches

Laches is an equitable defense and arises from "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Precision Shooting Equip., Inc. v. Golden Eagle Indus., LLC,* 2005 WL 1669120, at *1 (M.D. Fla. 2005). In order to put forth such a defense, a defendant must show that there was: (1)

an unreasonable delay in the plaintiff's assertion of a right or claim; (2) the delay was not excusable; and (3) the delay caused undue prejudice. *See Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, 1546 (11th Cir. 1984).

Here, the defense of laches is not applicable as Defendants have failed to show that Plaintiff's delay in bringing suit caused them undue prejudice. The defense of laches is meant to protect those defendants who spend time, effort, and money building their reputation under a particular brand name. *See, e.g., Internet Specialities West, Inc. v. Milon-DiGiorgio Enters. Inc.,* 559 F.3d 985, 992 (9th Cir. 2009) ("Laches is meant to protect an infringer whose efforts have been aimed at 'build[ing] a valuable business *around its trademark"* and "an important reliance *on the publicity of [its] mark,*'" citing 6 McCarthy on Trademarks and Unfair Competition §31:12 (emphasis in original)). If a plaintiff knows that a defendant is building goodwill around a particular mark, yet sits idly by, allowing defendant to incur ever increasing expenses, it is thought to be unfair to let plaintiff bring suit after an unreasonable delay as defendant would be forced to incur substantial resources re-branding its products, and/or building up goodwill under new trade names. *See, e.g., id.* In contrast, mere expenditures in promoting, advertising, and/or selling an infringing mark does not constitute undue prejudice for the purpose of laches. *Id.*

Here, the undisputed evidence shows that OEW did not utilize the Ford marks in order to establish brand recognition of its products; on the contrary, its products have always been sold under its own names. Ford marks were simply used by OEW for descriptive, incidental,

and/or decorative purposes. As a result, Ford is entitled to summary judgment on the defense of laches.

## C. Estoppel

"Equitable estoppel is based on principles of 'fair play and essential justice' and arises when one party lulls another party into a disadvantageous legal position." *Major League Baseball v. Morsani,* 790 So.2d 1071, 1076 (Fla. 2001). The defense requires: "(1) the party against whom estoppel is sought made a representation about a material fact that is contrary to a position it later asserts, and (2) the party seeking estoppel detrimentally relied on that representation." *SourceTrack LLC v. Ariba, Inc.,* 958 So.2d 523, 526 (Fla. App. 2007).

Here, Defendants argue that there is a genuine issue of material fact as to whether estoppel is applicable. Defendants rely on the fact that Mr. Moore engaged in several email communications with Ford's paralegal, Ms. Van Der Beek, in 2008. OEW contends that Moore believed that these discussions were fruitful, and that after Ms. Van Der Beek ceased communication, Mr. Moore was led to believe that all issues had been resolved. (Mr. Moore also cites the alleged fact that Ms. Van Der Beek informed him that he need not retain counsel). In sum, OEW contends that Ms. Van Der Beeks' conduct is sufficient to state a defense of estoppel.

This Court disagrees. A review of the correspondence between Ms. Van Der Beek and Mr. Moore makes it clear that Ford did not give the impression that it had accepted Moore's alleged cooperation as resolving the issue. Indeed, after Moore offered to settle for $5000, Ms. Van Der Beek stated that she could only consider a settlement offer if provided

with OEW's sales records for allegedly infringing wheels.  Only after Moore repeatedly failed to provide the sales records requested did Ms. Van Der Beek cease communication.

Moreover, Moore's claim that she lulled him into believing that Ford consented to OEW's modified cobra mark is without merit.  In fact, Ms. Van Der Beek specifically informed Mr. Moore that this modified design was not sufficient, stating "this is not acceptable."  Accordingly, Ford is entitled to summary judgment on this issue.

### D.    Waiver

"To establish a waiver defense, a party must bring forth proof of an intent to relinquish a known right."  *Amer. Hist. Racing Motorcycle v. Team Obsol. Prom.,* 33 F.Supp.2d 1000, 1007 (M.D. Fla. 1998).  Here, Defendants have failed to present evidence showing that Plaintiff intended to relinquish its trademark rights.  As a result, Ford is entitled to summary judgment on this issue.

### E.    Acquiescence

Acquiescence requires proof of three elements: "(1) that [the trademark owner] actively represented that it would not assert a right or a claim; (2) that the delay between the active representation and assertion of the right or claim was not excusable; and (3) that the delay caused [the defendant] undue prejudice.  *SunAmerica Corp. v. Sun Life Assur. Co. of Canada,* 77 F.3d 1325, 1344 (11th Cir. 1996), quoting *Coach House Rest. v. Coach and Six Rests.,* 934 F.2d 1551, 1558 (11th Cir. 1991).  The Eleventh Circuit has remarked that "[t]he distinguishing feature of the acquiescence defense is the element of *active* or *explicit* consent to the use of an allegedly infringing mark."  *Id.* (emphasis in original).

Here, Defendants have failed to present any evidence that Ford actively represented that it would not assert its trademark rights. As discussed above, Ms. Van Der Beek's communications with Mr. Moore do not constitute evidence of even an implicit intent to relinquish Ford's rights, let alone an explicit intent. Nor have Defendants offered any other evidence so showing. As a result, Ford is entitled to summary judgment on this issue.

### F. Unclean Hands

In order to assert the affirmative defense of unclean hands, a defendant must show: "(1) that a plaintiff's wrongdoing is directly related to the claim against which it is asserted" and (2) that it was personally injured by the plaintiff's conduct. *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 450-51 (11th Cir. 1993). Notably, in trademark infringement actions, courts have required "clear, convincing evidence of 'egregious' misconduct before invoking the doctrine of unclean hands." *Citizens Fin. Grp., Inc., v. Citizens Nat. Bank of Evans City,* 383 F.3d 110, 129 (3rd Cir. 2004).

Here, Defendants argue that Ford lulled OEW into believing it had satisfied Ford's concerns (via Ms. Van Der Beek's communications to James Moore), that it later refused to communicate with Moore, and that it then executed an ex parte seizure against OEW in bad faith. Defendants contend that Plaintiff took these actions in order to gain an unfair litigation advantage over OEW and to destroy OEW's business in order to make an example out of it.

For the reasons discussed above, this Court concludes that neither Ms. Van Der Beek's conversations with Mr. Moore nor Ford's later communicative silence lulled OEW into believing that it satisfied Ford's concerns. However, there is a genuine issue of material

fact with respect to whether Ford's ex parte seizure was executed in bad faith. Assuming that Ford moved for an ex parte seizure in bad faith, it is possible that Ford's actions could give rise to an unclean hands defense; at any rate, as Ford has failed to argue to the contrary, it has failed to meet its burden showing that this defense should be unavailable as a matter of law. As a result, it is inappropriate to rule on summary judgment on this issue. (There is also a genuine issue of material fact as to whether Defendants' own alleged misconduct bars them from raising this defense).

## G. Nominative Fair Use

Nominative fair use occurs when a defendant uses plaintiff's mark to identify plaintiff's goods or services for the purpose of facilitating the sale of defendants' products. 4 McCarthy on Trademarks and Unfair Competition §23:11 (4th ed.). For example, an aftermarket automobile dealer might advertise "wheels fit for FORD MUSTANG," or a computer software company might sell "software compatible with both WINDOWS and APPLE." Thus, among other applications, nominative fair use allows a legitimate seller of parts to use the trademark of a name brand product in order to put potential customers on notice that its parts are compatible with that product. *Id.*

Nominative fair use requires a defendant to show that: (1) the plaintiff's mark is necessary to identify plaintiff's product; (2) in doing so defendant does not use more of plaintiff's mark than necessary; and (3) "defendant's conduct or language reflect[s] the true and accurate relationship between plaintiff and defendant's products or services." *Century*

*21 Real Estate Corp. v. Lendingtree, Inc.,* 425 F.3d 211, 232 (3d Cir. 2005); *see also New Kids on the Block v. News Am. Pub., Inc.,* 971 F.2d 302, 308 (9th Cir. 1992).

Here, the only possible application of the nominative fair use defense concerns OEW's use of the descriptive word marks FORD, MUSTANG, COBRA, and the like, to describe which of its wheels fit Ford products.

With respect to OEW's listing "O.E. MUSTANG WHEELS" for sale (and like listings), the Court concludes that the defense is not available. The Court has already found that such listings give rise to a likelihood of confusion as a matter of law, and concludes here that such listings advertising "O.E." Ford wheels which are in reality not manufactured by Ford fail to "reflect the true and accurate relationship between the plaintiff and defendant's products and services," as they suggest that Ford manufactured, and/or is affiliated with these wheels.

However, Defendants sold numerous wheels compatible with Ford automobiles, under a variety of listing titles. In doing so, it was necessary to use Ford's trademarks in order to inform potential customers that its wheels would fit Ford vehicles; thus, this defense may turn out to be available. Whether this defense will ultimately prove successful will depend upon whether Defendants can also prove elements two and three, a contested issue of fact. As a result, there is a genuine issue of material fact with respect to the question of the availability of this defense.

### H. Descriptive Fair Use

Descriptive, or classic, fair use differs from nominative fair use. In descriptive fair use the defendant utilizes plaintiff's mark not to identify plaintiff's product, but merely to describe his own. *See, e.g.,* 4 McCarthy on Trademarks and Unfair Competition §23:11 (4th ed.). The defense of descriptive fair use is not applicable here, as Defendants have not alleged that they utilized Ford trademarks merely to describe their own products; on the contrary, the purpose of utilizing various Ford word marks such as MUSTANG was to inform potential customers that OEW wheels were compatible with specific Ford products. Thus, nominative fair use, not descriptive fair use, is the relevant "fair use" defense in this case. Accordingly, Ford is entitled to summary judgment on this issue.

### I. Actions Permitted

The FDUTPA does not apply to an "act or practice required or specifically permitted by federal or state law." FLA. STAT. § 501.212(1). To the extent that OEW's actions are found to be permitted under federal or state trademark law, this could serve as a possible defense to Plaintiff's FDUTPA claim. Thus, it is inappropriate to rule on summary judgment on this defense.

### J. First Sale Doctrine

Under the "first sale" doctrine, a trademark owner "loses its right of control over the use and distribution of the item on which the trademark is affixed once the item is released into the stream of commerce." *BMW of N. Am. v. Au-tomotive Gold, Inc.,* 1996 WL 1609124, at *6 (M.D. Fla. 1996). At that point, the trademark owner relinquishes its ability

to prevent the use or sale of the items upon which the trademark is affixed. *Id.* The owner's "first sale" constitutes an implicit authorization for purchasers of those products to use them for any legitimate purpose, including using those products as "component part[s] of a separate, distinct product." *Id.,* citing *Alexander Binzel Corp. v. Nu-Tecsys Corp.,* 785 F.Supp. 719, 721 (N.D. Ill. 1992) (Manufacturer who purchased "BMW" medallions from authorized dealers, and later incorporated them into license plates, and sold them with a disclaimer clarifying the product's origin was found to have acted appropriately under the "first sale" doctrine. *Id.* BMW, by placing the medallions into the stream of commerce, was thought to have implicitly authorized their use as component parts in distinct products. *Id.*)

Here, OEW contends both: (1) that many of its wheels bearing Ford trademarks were legitimately purchased from Ford and later resold by OEW; and (2) that OEW purchased numerous center caps from legitimate Ford sources, and later incorporated these caps into its wheels. Based on this evidence, it is possible that the First Sale Doctrine may be applicable, and thus it is inappropriate to rule for Ford on this issue on summary judgment. Indeed, Ford has pointed to no case authority that would justify granting summary judgment on this defense.

### K.    Abandonment

Under the Lanham Act, a trademark is deemed abandoned, and, thus no longer valid, "[w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. A defendant must establish two elements to show abandonment: "[1] that the plaintiff has ceased using the mark in dispute and [2] that he has done so with an intent not to resume its

use." *Natural Answers, Inc. v. SmithKline Beecham Corp.,* 529 F.3d 1325, 1329 (11th Cir. 2008). Nonuse of a mark for three consecutive years is prima facie evidence of abandonment. 15 U.S.C. § 1127.

Here, Mr. Moore, in his affidavit, states that Ford has failed to use its cobra mark for the past ten years. If true, this allegation would raise an inference of abandonment. Thus, Defendants have presented sufficient evidence to survive summary judgment on this issue.

### L.    Statute of Limitations

Defendants have presented some evidence that Ford brought some of its claims past the applicable statute of limitations period, whereas Plaintiff has presented no substantial argument showing why this defense should be unavailable. As a result, it is inappropriate to rule on summary judgment on this issue.

### M.    Implied or Express License

There is no evidence tending to show that Ford granted OEW an express license to use its trademarks; however, a court may find an implied license "when such a license can be reasonably inferred from the objective conduct of the parties." *Brinkman v. Beaulieu of Am., Inc.,* 2002 WL 32097534, at *4 (W.D. Tex. 2002). Specifically:

> Any language used by the owner of the intellectual property or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the intellectual property in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action.

*Pandora Jewelers 1995, Inc., v. Pandora Jewelry, LLC,* 2011 WL 2174012, *6 (S.D. Fla. 2011) (quoting *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed. Cir. 1995)).

"It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties." *Doeblers' Penn. Hybrids, Inc. v. Doebler,* 442 F.3d 812, 824 (3d Cir. 2006)**.**

Here, Defendants present evidence tending to show that Ford "flooded the market" with trademarked caps to its dealers and salvage yards, without placing restrictions on the reselling of those caps. Defendants' also present some evidence showing that Ford created trademarked caps specifically to be used on aftermarket, non-Ford manufactured wheels. In addition, Defendants present evidence that they bought caps from authorized Ford dealers for the express purpose of putting these caps on their own wheels and that they communicated this intent to these dealers. Defendants' evidence, if true, could be interpreted as showing that OEW had an implied license to utilize Ford trademarked center caps on OEW's wheels provided that OEW purchased those caps from legitimate sources. As a result, there exists a genuine issue of material fact with respect to the availability of an implied license defense.

### N.      Ex Parte Seizure Improper

The Court concludes that it is appropriate to rule for Ford on summary judgment on this claim as it is not an appropriate affirmative defense. Even if Ford's ex parte seizure was improper, Ford might still prevail on its affirmative claims. Thus, it is appropriate to rule for Ford on this issue.

### III.    Defendants' Motion for Partial Summary Judgment

####    A.    Defendant's Motion for Summary Judgment on Plaintiff's Counterfeiting Claims

The definition of "counterfeit" reaches only cases in which the counterfeit mark is used in connection with the same goods and services as those for which the mark is registered on the Principal Register and is in use. 15 U.S.C. § 1116(d)(1)(B)(I); *State of Idaho Potato Com'n v. G & T Terminal Packaging, Inc.,* 425 F.3d 708, 721 (C.A. 9 2005); *Timber Prods. Inspection, Inc. v. Coastal Container Corp.,* 2011 WL 5088707, *8 (W.D. Mich. 2011). McCarthy explains how this restriction works:

> Thus, if the mark REGIS is registered only for pens and pencils, while the trademark owner might well have a normal civil remedy against the unauthorized use of REGIS on writing paper, such a use is not a 'counterfeit....'

5 McCarthy on Trademarks and Unfair Competition §30:37 (4th ed.). Defendants point out that at the time of the ex parte seizure, Plaintiff's cobra mark was registered for "auto parts and accessories, *namely, interior insignia badges*..." (emphasis added). As the term "namely" is a definite term, the registration only applied to items specifically enumerated. *See, e.g., id.* As wheels and center caps were not named, they were not covered by the registration. As a result, Ford cannot prevail on its counterfeiting claim against OEW for use of Ford's unregistered cobra mark.[6] Accordingly, it is appropriate to rule for OEW on this issue.

---

[6]Ford later did obtain a federally registered cobra mark which specifically applied to wheels. OEW's use of the mark *after* Ford obtained this registration could subject OEW to liability for counterfeiting.

The Court does note, however, that Ford also brings counterfeiting charges based upon the alleged counterfeiting of the other marks described herein. As OEW has failed to show that there is no genuine issue of material fact with respect to OEW's counterfeiting of these other marks, it is inappropriate to rule on these claims on summary judgment.

## B.     Defendants' Counterclaim for Wrongful Seizure

15 U.S.C. § 1116(d)(11) provides that "A person who suffers damage by reason of a wrongful seizure [...under the ex parte seizure provision] has a cause of action against the applicant for the order under which such seizure was made...." Notably, a party may ultimately prevail at trial on its infringement claim, yet still be liable for wrongful seizure. *Martin's Herend Imports v. Diamond & Gem Trading,* 112 F.3d 1296, 1306 (5th Cir. 1997).

In order to establish a claim for wrongful seizure, the claimant must show: (1) that the seizure was brought in bad faith; or (2) that the items seized were predominately legitimate. *Martin's Herend Imports v. Diamond & Gem Trading,* 195 F.3d 765, at 773 (5th Cir. 1999).[7] In analyzing a wrongful seizure claim, a court will not revisit whether the ex parte seizure should have been granted in the first instance; on the contrary, it will only consider whether plaintiff sought the seizure in bad faith, and/or seized predominately legitimate goods. *Id.* at 774.

Defendants contend that Ford is liable for wrongful seizure under both prongs enumerated above. As an initial matter, Defendants contend that Ford acted in bad faith in

_____

[7]If a claimant establishes wrongful seizure based upon bad faith, such claimant may also recover punitive damages. *Id.*

pursuing an ex parte seizure. In support of this contention, Defendants cite to a number of facts which they contend show Ford's bad faith.

First, Defendants reiterate the fact that Ford's federally registered cobra mark did not apply to wheel caps at the time of the seizure. Defendants also present evidence tending to show that Ford knew that its registration failed to so apply. As a result, Defendants argue that Plaintiff knowingly pursued an ex parte seizure for unregistered marks, which they contend shows bad faith.[8]

In response, Ford cites to the fact that it moved for an ex parte seizure order based upon Defendants' supposed infringement of four of its marks, the validity of the other three being unchallenged by Defendants.[9] As a result, Ford argues that, even if Ford's federally registered cobra mark did not cover wheels, it undisputedly had a good faith basis for protecting its other three marks.

Second, OEW complains that Ford improperly knowingly sought its ex parte seizure against a reputable merchant. Since an ex parte seizure is not an appropriate remedy against such a merchant, OEW contends that Ford acted in bad faith.[10] In addition, OEW alleges that Ford improperly misled this Court into believing that an ex parte seizure was appropriate

---

[8]OEW also alleges that, in its ex parte motion, Ford misrepresented the limited scope of its cobra registration in order to mislead this Court into believing it applied to wheels and center caps. Ford denies this.

[9]Although it does appear that Ford's primary concern was OEW's use of its cobra mark.

[10]OEW vigorously contends that it is reputable, evidenced by its permanent office space, its large inventory, permanent staff of employees, and alleged excellent customer reputation.

against a business with a fixed location and regular business operations, by, inter alia, selectively quoting from McCarthy's Treatise.

Ford argues that OEW is not in fact a reputable business, and that it at least sought the seizure *reasonably believing* that OEW was not reputable as Ford's investigators uncovered evidence tending to show that OEW was not a legitimate business. Moreover, it contends that it had reason to worry that OEW would simply remove the various alleged infringing center caps had OEW been given advance notice of the seizure order. Thus, Ford contends that it acted in good faith. Ford also denies that it misled this Court in any way.

Third, OEW alleges that Ford failed to disclose to the Court that OEW was actively cooperating with Ford (based on Mr. Moore's correspondence with Ms. Van Der Beek) in order to resolve Ford's trademark concerns.

In response, Ford argues that the parties' attempt to cooperate ended in failure, that Ford's issues were not resolved, and that Ford retained the concern that OEW might remove all infringing caps upon being given notice of a seizure.

Fourth, OEW argues that Ford's almost two-year delay in bringing suit from the time it first became cognizant of OEW's activity shows bad faith. In support of this contention, OEW cites a number of cases holding that it may be inappropriate to issue an ex parte seizure in the face of a long delay.

Ford contends that, even if true, this is not the time to revisit the issue of whether the seizure order was properly granted in the first instance. On the contrary, it emphasizes that the issue here is whether Ford brought the seizure in bad faith, and it argues that the fact that

it did not seek the ex parte seizure order immediately fails to show that it sought that order in bad faith.

Whether Ford sought the ex parte seizure in bad faith depends upon Ford's motivations and reasons for seeking such an order. This Court concludes that, viewing the above-described evidence in a light most favorable to Defendants, a reasonable juror could conclude that Ford sought to improperly seek an ex parte seizure in bad faith, i.e., knowing that it was not merited under the law and facts of this case. For example, a juror could conclude that Ford's primary interest in seeking the order was to seize wheels with OEW's cobra marks, that Ford knew that its federal registration did not cover such marks, that it was improper to seek a seizure of unregistered marks, and that Ford misled the Court into thinking that an ex parte seizure was nonetheless appropriate.

On the other hand, viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could conclude that Ford's alleged acts of misfeasance were, if not entirely proper, undertaken in a good faith effort to protect its legitimate registered marks. Accordingly, the Court concludes that there is a genuine issue of material fact with respect to whether Ford sought the ex parte seizure in bad faith. As a result, it is inappropriate to rule on this issue on summary judgment.

The Court does conclude, however, that Ford's failure to disclose in its ex parte motion the Eleventh Circuit decision in *N. Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211 (11th Cir. 2008) fails to show bad faith as a matter of law. While the *Axiom* court seriously doubted whether the Eleventh Circuit's rule, that a finding of likelihood of

confusion in trademark infringement cases gives rise to a presumption of irreparable injury, was still viable, it specifically declined to decide the issue. *Id.* at 1227-28. As a result, *Axiom* is not direct, contrary, controlling authority, and the Court therefore concludes that Ford's failure to cite to the case does not show bad faith.

Defendants also argue that they are entitled to summary judgment on their wrongful seizure counterclaim based upon the second prong, to wit, that Ford seized predominately legitimate goods. Here, the court also concludes that there exists a genuine issue of material fact, precluding summary judgment. Defendants present some evidence that approximately 3,000 of the 10,000 wheels seized had blank or FM wheel caps, and that many others had the cobra racing cap with the superimposed "OE Racing" logo. As the Court has determined that there is a genuine issue of material fact with respect to whether these modified cobra caps are infringing, it is possible that OEM could prove that Ford predominately seized legitimate goods. Thus, it is inappropriate to rule on this claim on summary judgment.

It is therefore **ORDERED AND ADJUDGED** that:

1. Plaintiff Ford Motor Company's Motion for Summary Judgment on its Affirmative Claims (Dkt. 113) is hereby granted in part, and denied in part, as stated herein.

2. Plaintiff Ford Motor Company's Motion for Summary Judgment on Defendants' Affirmative Defenses (Dkt. 114) is hereby granted in part, and denied in part, as stated herein.

3.     Defendants' Motion for Partial Summary Judgment on its Counterclaims (Dkt. 110), is hereby granted in part, and denied in part, as stated herein.

**DONE** and **ORDERED** in Tampa, Florida on April 12, 2012.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2009\09-cv-2137.msj.frm